## Case No. 14,763.

UNITED STATES v. CENTRAL PAC. R. CO.

[4 Sawy. 341.] [1]

Circuit Court, D. California.    Oct. 15, 1877.[2]

RAILROADS—CENTRAL PACIFIC—SUBSIDY BONDS—
ACCEPTANCE OF ROAD.

The Central Pacific Railroad Company did not become liable to apply five per centum of the net earnings of the Central Pacific Railroad annually to the payment of the subsidy bonds and interest thereon, issued to said company by the United States in pursuance of the acts of congress authorizing the construction of the said road, till October 1, 1874, the date of the completion of the road as accepted by the president of the United States, and the day upon which it was in fact completed, in accordance with the requirements of said acts.

Action to recover five per centum of the net earnings of the Central Pacific Railroad Company from July 15, 1869. The case was tried by the court, without a jury, upon stipulation of the parties. The court found the following facts: By direction of the president of the United States, a board of engineers and men familiar with railroads was convened, to consider and report a standard for the construction of the Pacific railroads,

1 [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]
2 [Reversed in 99 U. S. 449.]

by which the companies should be governed in building the roads, and the commissioners appointed under the acts of congress for the purpose, in their examinations and reports upon the roads constructed. In February, 1866, this board reported a standard, which was approved and afterward acted upon by the president. In their report, the board, among other things, say:

"Culverts and abutments for bridges and drains should be of stone, whenever a durable article can be obtained within a reasonable distance—say from five to eight miles—depending upon circumstances; provided that temporary trestles may be adopted upon assurances, to the satisfaction of the commissioners, that stone abutments will be substituted immediately after the line shall be opened, so that stone can be transported thereon. * * * A railroad cannot be considered complete until it is well ballasted. If composed of gravel or broken stone, it should be from twelve to twenty-four inches thick, depending upon the lower material. In view of the settling of new embankments, which require time and rains before ballasting can be properly placed, and also in view of the number of miles required by the law to be constructed annually, the perfect finish of the road-bed, in this respect, must be progressive and the work of time. Yet it is the opinion of the board that such work of perfecting the ballast must proceed as usual on first-class railroads; otherwise subsequent sections should not be accepted, because the whole work is not then being carried forward as a great Pacific railroad, such as the law contemplates."

The report also specifies what should be required as to location, grades and curves, embankments and excavations, cross-ties, rails, sidings, rolling stock, buildings, etc. The report recognizing the impracticability, as a business transaction, of completing a long line of road like the Pacific Railroad in sections of twenty miles each, so that each section shall be brought up to the standard of a first-class road as soon as constructed, clearly made a distinction between a provisional and absolute completion, and this distinction was recognized and acted upon by the president, subsequently, who accepted the sections when constructed up to the temporary standard provisionally, for the purpose of issuing the bonds to enable the companies to proceed with the work, but with the understanding that the deficiencies should be supplied so as to ultimately bring the whole road, as an entirety, up to the standard of a first-class road before a final acceptance as absolutely completed as a whole. As each section of twenty miles or more of the road was constructed, the president of the company filed a statement, under oath, in pursuance of the statute, to the effect that the section, describing it, had been completed as required, specifying the particulars in the language of the statute, and asking that the

commissioners appointed under the statute might be notified, and that they might examine and report upon such section. Upon a favorable report by the commissioners, the president accepted the section provisionally, and issued to the company the bonds authorized by the statute. This was the course of proceeding till 1868, when it was found that the government might advance all the subsidies upon a road only provisionally accepted in sections, and have no security for its absolute completion, as a whole, up to the standard of a first-class road. The question of the propriety of this course was submitted to the attorney-general, who rendered an opinion on September 5, 1868, which was to the effect that the course before pursued by the government was in accordance with the law, and that the president had authority to appoint commissioners to review that portion of the road which had been accepted provisionally, and to refuse a final acceptance of the road, as a whole, until all deficiencies should be supplied; and that sufficient subsidies might be withheld, or other guarantees be required of the company, to secure absolute completion. The opinion is reported in 12 Op. Attys. Gen., at page 477; and is referred to as a part of this statement of facts. The president thenceforth acted upon this opinion of the attorney-general, and accepted each section when provisionally completed, leaving the question of the absolute completion of the road, as a whole, to be determined upon examination and report of commissioners to be specially appointed for that purpose.

On September 25, 1868, the president, in pursuance of the opinion of the attorney-general, appointed a commission of civil engineers to examine the entire road, so far as then provisionally completed, and report upon it in accordance with instructions to be furnished by the secretary of the interior. Instructions were prepared, in which, after referring to the standard adopted by the president, a pamphlet copy of which was furnished, the secretary of the interior says:

"This standard had obvious reference, in the first instance, to a provisional completeness, but assurances were given by the companies that the road, in structure, equipments, and every other particular, should be brought up with all practicable dispatch to the standard prescribed by congress. The rapid construction of this great national thoroughfare being deemed vitally important, it was not originally considered that in the early stages of the enterprise the standard of absolute completeness of each section should be exacted as a condition precedent to the payment of the subsidy. As the government has made such munificent advances, it becomes the duty of the executive, in the present advanced stages of the work, to require that all past omissions shall now be supplied, and that in lieu of temporary structures, those which are permanent and sub-

stantial shall be erected, and to secure from the companies a strict compliance with all the requirements in regard to the appurtenances of the road. It is believed that the time has now arrived for a thorough revision of the work. * * * It is proper to state, however, that the department expects that you will make a thorough personal examination of the road so far as it has been built. You will fully report in regard to its location, road-bed, cross-ties, track-laying, ballasting, rolling stock, repair-shops, station-buildings, culverts, bridges, viaducts, turnouts, and all other appurtenances, and what amount of expenditure will be required in order that the road, so far as built, may be rendered in these particulars equal to a full completed first-class railroad."

These commissioners, having completed their examination, made their report on May 14, 1869, in which they point out specifically many particulars in which the road, as constructed, fails to come up to the standard of a first-class road; and they report an estimate in detail showing that, in their opinion, to supply such deficiencies on five hundred and fifty-one miles of road eastward from Sacramento will require a further expenditure of $4,493,380. They say, in their report, with reference to one deficiency, that "east of Truckee station, and especially up the Humboldt valley, the road for almost its entire length is wholly without ballast." On April 10, 1869 (16 Stat. 56), congress passed a joint resolution by which the president was "authorized to appoint a board of eminent citizens, not exceeding five in number * * * to examine and report upon the condition of, and what sum or sums, if any, will be required to complete each of said roads (the Union and Central Pacific roads) for the entire length thereof to the said terminus as a first-class railroad, in compliance with the several acts relating to said roads." The president was thereby, also, "authorized and required to withhold from each of said companies an amount of subsidy bonds authorized to be issued by the United States, under said acts, to secure the full completion as a first-class road of all sections of such road upon which bonds have already been issued, or, in lieu of such bonds, he may receive as such security an equal amount of first mortgage bonds of such company." In default of giving such security, the president was authorized to direct the attorney-general to take such proceedings as might be necessary to protect the interests of the United States in such road, "and to insure the full completion thereof as a first-class road, as required by law and the statutes in that case made."

In pursuance of this joint resolution the president of the United States appointed a board, which has since been known and styled as in the resolution, the "Board of Eminent Citizens." The connecting rail uniting the Central and Union Pacific Railroads was laid on May 11, 1869, and soon thereafter regular through passenger trains between San Francisco and Omaha, carrying the United States mails, and through freight trains were placed upon said roads, and such trains have run regularly between said points ever since. Afterward, in the month of September, 1869, and subsequent to the provisional acceptance of the last section on July 15, as hereinafter stated, the said "board of eminent citizens" commenced the examination of said Central Pacific Railroad, in pursuance of said joint resolution and the instructions given by the secretary of the interior. The board, among other things, was furnished with a copy of the said instructions given to the said previous board of engineers and of their report, and directed to be governed thereby in their examinations, and were further instructed as follows: That you will "not only ascertain and report upon its condition, but will also state what sum or sums, if any, will be required to complete it, for the entire length thereof, as a first-class railroad, in compliance with the several acts of congress relating thereto." After completing their examination the board made its report on October 30, 1869, in which it gives a detailed estimate of the cost of work necessary to be done on the Central Pacific Railroad from Sacramento eastward, in order to complete it in accordance with the acts of congress, amounting in the aggregate to $576,650.

Pending the action of the said former "commission of civil engineers," on March 22, 1869, the secretary of the interior, to secure the proper completion of said railroad as required by law, issued an order to the commissioner of the general land-office to withhold all patents for lands to the defendant until further orders, and soon thereafter, as further security, required the said defendant to deposit with the secretary of the treasury $4,000,000 of its first mortgage bonds; which order the defendant complied with, in the months of May and June, 1869; and in connection with the deposit of said bonds on June 28, 1869, executed and delivered to said secretary an instrument in writing, wherein it is, among other things, agreed that "the four millions of dollars of first mortgage bonds of said company which it has this day deposited with the government * * * are and may and shall be held by the government as security for the completion of the structure and equipment of the road of said company, according to the provisions of the statute * * * until the president of the United States, on a proper examination of the actual completed road and equipments, shall be satisfied that the same are so completed as a first-class railroad according to law." And further, on failure to so complete the road, "the said bonds shall be held by the government, and shall be disposed of, and the proceeds thereof, if disposed of, applied to the proper completion of said road,

its structure and equipments, as the government of the United States shall by law direct and provide. And it is further agreed, that the lands granted as a portion of the subsidy of said company, for which patents have not been issued, shall also be held in like manner by the government of the United States as security for the completion and equipment of the said railroad as aforesaid," etc. On July 15, 1869, the secretary of the interior transmitted to the president the report, dated May 15, 1869, of the commissioners appointed to examine and report upon a section of twenty and three-tenths miles of the Central Pacific Railroad, this being the last section constructed by said defendant. In his letter transmitting said report to the president for his action, the secretary says: "I respectfully recommend the acceptance of the same, and that bonds be issued to the company thereon in accordance with the agreement made with the company, which is to the effect that they deposit their first mortgage bonds with the secretary of the treasury to such amount as may be deemed necessary to secure the ultimate completion of the road agreeably to the provisions of the act approved July 1, 1862." The agreement referred to is the agreement hereinbefore referred to, of date June 28, 1869. Which letter and report were returned to the secretary of the interior by the president, with an indorsement thereon as follows, to wit: "The recommendations of the secretary of the interior are approved, and the secretary of the treasury and himself are hereby directed to carry the same into effect. U. S. Grant."

Recommendations in all respects similar to the last had been made by the secretary of the interior to the president, as to the reports made upon several preceding sections of the roads, and a similar approval was indorsed thereon by the president. Upon the same day, July 15, 1869, the secretary of the interior made a similar recommendation as to the section commissioners' reports upon the last sections of the Union Pacific Railroad, in which he recommends a similar provisional acceptance of the section, and adds: "Provided, however, that no bonds or patents shall in any event be issued until such security shall be deposited with the secretary of the treasury necessary to secure the ultimate completion of the road, agreeably to the acts mentioned in my letter to you of the 27th of May last." This recommendation was approved by the president, and the secretaries of the treasury and interior directed to carry the same into effect. These constitute the last conditional acceptances of sections as provisionally completed, and is the point of time at which the government now claims the roads to have been completed, for the purpose of entitling it to recover five per centum of the net earnings of the roads.

Subsequently, in September, 1869, the secretary of the treasury denied an application of defendant to withdraw the $4,493,380 first mortgage and government bonds deposited and withheld as security as aforesaid, and declined to surrender any security so held until the "board of eminent citizens should report." On November 3, 1869, the said board having in the meantime reported, and it appearing by their report that the amount required to supply deficiencies and complete the work up to the required standard had been reduced since the last commission's report from $4,498,380 to $576.650, the secretary of the interior so modified his order of March 22, 1869, suspending the issue of patents to land as to allow patents to one-half the lands —every alternate odd section—to be issued, and soon after allowed the withdrawal of said first mortgage and other bonds, still retaining as security the other half of the lands. On November 15, 1869, the secretary of the interior, in his annual report to the president, states the condition and circumstances of said railroads; points out particulars wherein deficiencies in the construction still exist; reports the amount necessary to be expended in completing the road up to the required standard; states the securities held for the purpose of insuring its completion, and adds: "It will thus be perceived that the government has ample means to secure from the companies the faithful performance of their respective engagements." On March 27, 1871, the secretary of the interior refused an application by defendant to modify the order of November 3, 1869, continuing the suspension of the issuing of patents to one-half the lands. He concludes his letter of denial as follows: "Before modifying the order suspending the issue of patents on one-half of the lands, I desire a report showing the erroneous location to have been corrected, and that the deficiencies have been supplied. Whenever the company shall express a desire for a further examination of the road, commissioners will be appointed for that purpose." There were other refusals to issue patents by the secretary of the interior.

In 1874 there was a bill pending in the senate which had passed the house, in response to demands of the people of the several states interested, providing that the title to the lands granted for railroad purposes should at once be vested in the grantees, in order that the states might tax them. On June 9, 1874, the chairman of the senate committee on railroads, by direction of the committee, transmitted a copy of said bill to the secretary of the interior, requesting his views and suggestions with reference to the advisability of the proposed legislation. On June 17, 1874, the secretary responded, setting forth the proceedings of the various commissions and the reports of deficiencies; the reservation of one-half these lands by Secretary Cox's order as security for completion of the road; that "the executive had no official information that the deficiencies had been supplied"; that the subsidy bonds had been received in full, and that "this moiety of lands

withheld is the only security of the government for the completion of the road as required by law." He then points out a provision in the bill, which, he says, "ipso facto repeals the said order of Mr. Cox," and suggests that it be so changed as to make the mandatory order of the commissioner of the land-office to issue patents "contingent on the executive being satisfied that all the deficiencies reported by the said 'eminent citizens' have been supplied, and that the roads are completed as required by law."

On August 2, 1874, the defendant addressed a communication to the secretary of the interior, in which it is stated that "the Central Pacific road is now completed and in successful operation," and it "requests that commissioners be appointed to examine the road with a view to its final acceptance by the United States government." In pursuance of said request, the president appointed commissioners, and in a letter of instructions to the commissioners, dated September 21, 1874, among other things, the secretary of the interior says: "On the 30th of October, 1869, 'five eminent citizens,' who were appointed commissioners by the president under joint resolution of the 30th of April, 1869, reported certain deficiencies in the construction of the Central Pacific Railroad. The vice-president of the company that constructed the road applied on the second ultimo for its re-examination to determine whether it has been completed as required by law and the report of said commissioners. * * * It will be your duty to examine said road with special reference to the deficiencies above referred to, and to report whether they have been substantially supplied. * * * If they have been, and the road is completed substantially, as required by the law and departmental instructions, you will ascertain as near as possible and report the date of the completion. * * * If it be not yet completed, you will state what, in your judgment, is necessary to such completion." Copies of the report of the preceding commissioners and of the pamphlet, showing the standard adopted by the department, were furnished the commissioners as a part of their instructions.

On November 2, 1874, the said commission reported that the defendant had completed its railroad in conformity to the requirements of the law, and that the date of such completion was October 1, 1874, and further reported that between the date of the report of the last preceding commission, October 30, 1869, and said October 1, 1874, said defendant had expended, in making the improvements specified, $5,121,037.23. On November 12, 1874, the secretary of the interior transmitted to the president the said report, together with a communication, stating the action of the several commissions, and closing as follows: "Regarding the order of Mr. Secretary Cox, of November 3, 1869, as a conditional acceptance of said road, and finding that the conditions have since been amply

and fully complied with, I respectfully recommend that the secretary of the interior be authorized to issue patents to the company for the lands inuring to it, and that said order withholding them be revoked." Upon which communication the president, on November 14, 1874, made and signed the following indorsement: "The within recommendations are hereby approved, the authority asked for conferred, and the order of the 3d of November, 1869, is revoked." On November 18, 1874, in accordance with said order, the commissioner of the general land-office was informed by the secretary of the interior of the revocation of said order, and directed to issue to defendant patents to the remaining lands due.

Upon other evidence than the action of the government and its officials, and the report of said several commissions, the court also found, as facts, that the said Central Pacific Railroad was not, in fact, completed up to the standard of a first-class railroad till the 1st day of October, 1874; that five hundred and fifty-one miles of said railroad was built during the first five months of the year 1869, in a very hasty and imperfect manner; that cuts and embankments had to be subsequently widened; temporary structures replaced or perfected; the line straightened in some instances, and several new tunnels constructed; that this part of the road was unballasted; that ballasting up to the standard of a first-class railroad is a gradual, progressive work, requiring time to settle the road-bed, and rains to compact and consolidate it; and that to ballast this road, at that time, up to the required standard under the existing conditions, would have been wholly impracticable; and that no road can be called first-class until well ballasted. Also, that the defendant, between October 30, 1869, and October 1, 1874, in fact expended in construction, in bringing the road up to the standard of a first-class railroad, equipments, etc., $5,657,854. Of this sum $1,014,681.34 was for wharves and depot buildings at Oakland and San Francisco; $241,490.87 for improvements of depot grounds at Mission Bay, San Francisco, and $105,906.60 for steamer Thoroughfare for ferrying cars across the bay. The remainder was expended in various improvements along the whole line, additional equipments, and other work necessary to make it in all respects a first-class road.

John M. Coghlan, U. S. Atty.

S. W. Sanderson and S. M. Wilson, for defendant.

SAWYER, Circuit Judge (after stating the facts). Upon the facts of the case as found and stated, two questions have been raised and fully argued: (1) At what point of time was the road so fully completed as to make it obligatory upon the defendant to apply five per centum of the net earnings of the road to the payment of the bonds issued by

the government, and the interest thereon? (2) What constitutes net earnings within the meaning of the act?

Upon the first question the government insists that the road was completed, and the obligation to set aside five per centum of the net earnings arose on July 15, 1869, the date of the provisional acceptance of the last section; while the defendant maintains that the road was not completed as a whole until October 1, 1874, the date at which the whole road was accepted by the president as having been fully completed.

The act of congress, and the acceptance by the defendant constitute a contract between the parties by the terms of which the defendant was required to build and complete such a road as is prescribed in the act—a road "supplied with all necessary drains, culverts, viaducts, crossings, sidings, bridges. turnouts, watering-places, depots, equipments, furniture, and all other appurtenances of a first-class railroad;" in other words, in all respects a first-class railroad, with all appropriate equipments and appurtenances. Such a road the defendant was bound to build and fully complete, and until so built and completed as a whole, it was not entitled to be discharged from the obligations of the contract to complete the road, or to receive the full consideration which the government, on its part, undertook to give. So, also, in addition to constructing the road. another obligation was imposed on defendant; for the act provides that "after the said road is completed, until said bonds (bonds issued by the government) and interest are paid, at least five per centum of the net earnings of said road shall also be annually applied to the payment thereof." And this is the clause under which this action is brought. It is plain that the point of time at which the defendant becomes liable to thus apply five per centum of the net earnings, is the point of time when it has fully completed the construction of the road as a whole, as an entirety, so that its contract is fully discharged so far as the construction is concerned, and the defendant has thereby become entitled to receive all the consideration therefor which the government undertook to give —the point of time when it becomes entitled to all the lands granted and all the bonds and other subsidies promised. The clause is "after said road is completed"—not a part or section, but said road. When the road is completed for the purpose of casting the obligation upon defendant of applying five per centum of the net earnings of the road to the payment of the government bonds and interest, it is also completed for the purpose of entitling it to have the road accepted, and of exonerating it from any further liabilities for construction, and for the purpose of entitling it to receive all the lands and other aid given by the government. The construction of the statute as to the time when the road is completed, must be the same when it

operates in favor of the defendant as when it operates in favor of the government. If the road was completed on July 15, 1869, so as to make it the duty of the defendant to apply five per centum of its net earnings to the payment of the subsidy bonds and interest. it was completed for the purpose of exonerating the defendant from expending further sums in the construction of the road, and for the purpose of entitling it to all the lands granted.

But the statute authorized the president, upon the report of commissioners appointed by him, to determine when the road should be deemed completed. Upon the completion of a section of forty, afterward twenty miles of road, the president of the United States was authorized by section 4 of the act "to appoint three commissioners to examine the same, and report to him in relation thereto; and if it shall appear to him that forty consecutive miles of said railroad and telegraph line have been completed." etc., "patents shall issue conveying the right and title to said lands to said company," etc. The commissioners were to report "to him"—the president—for his information, and if "it shall appear to him" that the section is completed, then the defendant is to be entitled to the corresponding part of the subsidy. This provision clearly devolves the duty upon the president of determining when the road is completed. This was so held by Mr. Attorney-General Evarts, in an elaborate opinion given to the president for his guidance in 1868, and I think correctly. 12 Op. Attys. Gen. 477. And this determination of the president I think conclusive, at least, upon the government. If so, it settles the question, for there can be no dispute as to what the action of the president and of the secretary of the interior, acting under his directions, actually was. The acceptance of sections from time to time, as constructed, was manifestly provisional—all the later ones being expressly so in terms upon their face. The whole action of the government is in harmony with this view, and utterly inconsistent with any other, as will be seen by a brief recapitulation of the facts, which speak for themselves. So early as September 25, 1868, the president appointed a commission of civil engineers to examine the entire road so far as then provisionally accepted, and to report wherein it was not completed up to the standard required by the statute. This commission made a thorough examination, and on May 20, 1869, which is subsequent to laying the connecting rail uniting the two roads, made a minute and exhaustive report, showing that it would require $4,493,380 to bring the five hundred and fifty-one miles of the provisionally completed road examined by them up to the required standard. Without waiting for the action of the commission. the secretary of the interior, on March 22, 1869, for the purpose of withholding the lands as security for the completion of the

road according to the statute, issued an order suspending the issue of all patents to lands due on completion of the road. At this time but a small portion of the lands belonging to the sections provisionally completed had been patented to the defendant, so that this order, in fact, withheld nearly all the lands to which the defendant was entitled, provided the road was so far completed.

In April, also, congress authorized the appointment of another commission of eminent citizens to re-examine the road and report deficiencies, and in express terms authorized the president, as further security for the completion of the road, to withhold subsidy bonds, or require the delivery of first mortgage bonds, or the return of subsidy bonds already received, sufficient to insure a full performance of the contract. Under this authority, so late as June 28, 1869, more than six weeks after the laying of the connecting rail, and after the favorable report of the section commissioners upon the last section constructed had been made, and only two weeks before its conditional acceptance by the secretary and approval by the president, the secretary required the defendant to deposit $4,000,000 of its first mortgage bonds, and to enter into an agreement that the bonds, together with the lands still unpatented, should be held as security for the completion of the road, and it was upon this deposit and agreement that the last section was conditionally accepted, and the subsidy bonds issued, as expressly appears in terms in the recommendation of the secretary, which was approved by the president. In this condition matters stood till the "board of eminent citizens" re-examined the road and reported October 30, 1869, that it would require only $576,650 to complete the road according to the acts of congress. After this report, the secretary of the interior deeming one-half the lands ample security for the completion of the road, on November 3, 1869, modified the order of March 22, 1869, so as to permit the alternate sections of lands granted to be patented, retaining the other alternate sections as security; and soon after delivered to defendant the said bonds deposited and withheld as security. Subsequently, on March 24, 1871, the secretary of the interior denied an application of the defendant to modify the order of November 3, 1869, whereby one-half of the land was withheld as security for the completion of the work, on the ground that it did not yet appear that "the erroneous locations have been corrected and that the deficiencies have been supplied;" but he offered to appoint another commission whenever the defendant should desire it. Other applications for patents were denied. Again, so late as June 17, 1874, the secretary of the interior objected to any legislation by congress affecting his right to withhold these lands as security, until the executive should be "satisfied that all deficiencies reported by said 'eminent citizens' have been supplied, and that the roads are completed as

required by law." Upon application of the defendant another and, as it proved to be, a final commission was appointed September 21, 1874, to report upon the road, and if completed, the date of such completion, which commission examined the road, and on November 2, 1874, reported the deficiencies supplied and the road completed; and that the date of its completion was October 1, 1874. Upon the recommendation of the secretary of the interior, the president, on November 14, 1874, approved this report and the secretary's recommendation, and thereupon vacated the order of November 3, 1869, suspending the issue of patents to one-half the lands. This recapitulation of the facts shows that at the times mentioned, neither congress, nor the secretary of the interior, nor the president, regarded the road as completed; that the acceptance of sections was conditional and provisional only, for the purpose of issuing bonds and enabling the companies to proceed with the work; that the government required a subsequent completion up to the standard required by the statute, and at all times retained in its possession and under its control ample security for the completion of the road; that it was not accepted as completed up to the standard required by the statute till November 14, 1874; and that the date of the completion as fixed by the report of the commission accepted and approved by the president, is October 1, 1874. No argument can add force to this simple statement of the facts, or shake or qualify the conclusions resulting therefrom. If the road was completed on July 15, 1869, as now claimed by the government for the purposes of this action, then the government wrongfully withheld from the defendant all the lands granted to it (except the small portion before that date patented) from July 15, 1869, till November 3, 1869, together with $4,498,380 first mortgage and subsidy bonds deposited in May and June, and otherwise withheld; and further wrongfully withheld, thereby depriving the defendant of their use, one-half or every alternate section of the lands due, till November 14, 1874—a period of more than five years after the completion of the road, as now claimed by the government. This is the necessary result, unless we adopt one rule of construction as to what constitutes a "completion of the road," when it is beneficial to the government, and another when the rights of the defendant are considered. It results, then, that if the president of the United States was authorized to determine the question as to when the road was completed, that determination was not made till November 14, 1874, and the time of the completion was October 1, 1874, at which time the liability of the defendant to be called upon to apply five per centum of the net earnings of the road commenced.

But if the decision of the president and action of the government are not conclusive upon the United States upon this point, it is still found as a fact that the said railroad

was not, in point of fact, completed and equipped up to the standard of a first-class railroad, as required by the statute, till October 1, 1874. Five hundred and fifty-one miles of railroad were constructed eastward from the Sierra Nevada Mountains during the five months ending May 11, 1869, to a great extent through a desert, and during the greater part of the year, including all except the earlier part of the period of construction, a rainless region. The testimony of the engineer shows, as also does the report of the engineers appointed by the president to recommend a standard for the construction of the road, that to bring a railroad up to first-class, as a practical business proceeding, requires time after the mere laying of the rails; that a road of one or two thousand miles' length cannot, as a practical business transaction, be completely ballasted, equipped and supplied with all the conveniences and accommodations of a first-class road as a whole, in sections of twenty miles each, hastily constructed, so that each section, when so constructed, shall be so complete in construction, equipment and appointment, as to fill its place as a part of the whole completed first-class road; that in such cases ordinary practical business economy requires temporary structures to be gradually replaced as they become unfit for use; and ballasting to be a progressive work, affording time for the embankments to settle by use, and to be rendered compact by rains. As a practical business undertaking it would manifestly be preposterous to expect that five hundred and fifty-one miles of road should be constructed up the Humboldt river, through a rainless desert, in the year 1869, and prior to the fifteenth day of July of that year, and be properly ballasted, and "supplied with all necessary drains, culverts, viaducts, crossings, sidings, bridges, turnouts, watering-places, depots, equipments, furniture and all other appurtenances of a first-class railroad;" and no such feat was in fact performed. It is true that this number of miles of road was constructed, so as to be capable of use; and it was in fact in constant use from that time on; but the law requires something more than a road capable of use. It requires in all particulars a first-class road, and the government was not bound to accept anything short of a first-class railroad.

The construction of this road was pushed forward with unprecedented energy and haste for the purpose of getting it open for traffic. When this object was accomplished, the defendant, subsequently, acted upon sound, practical, economical business principles, and brought the road up to the standard required, by correcting locations, widening cuts and embankments, substituting permanent for temporary structures, ballasting, furnishing water stations, depots, sidings, equipments, etc., by degrees, in the same mode as the testimony shows is usual in the construction and equipment of other extensive first-class roads. The defendant was at that time under no legal obligation to make any greater haste in bringing the road up to the proper standard than was required by sound, practical, economical business principles. The law gave defendant nearly seven years after July 15, 1869, within which to complete the road; and the government held in its own hands ample securities to insure its completion, and lost by the delay nothing to which it was entitled under the law or the contract; and the road is, doubtless, better for being gradually brought to the required standard. The road was finally completed and accepted nearly two years before the time required by the statute, and the government cannot complain that the completion was not in due time. It is earnestly urged on behalf of the government that the road was so far completed as to enable the defendant to make a profitable use of it, and, since this is so, it ought to be held to be completed, for the purpose of requiring the defendant to apply five per centum of the net earnings to the payment of the subsidy bonds and interest. Unfortunately for the argument and the government, the statute does not make the point of time at which the road is capable of use the one at which the liability of the defendant to apply five per centum of the net profits to the payment of the subsidy bonds attaches; but the completion of the road—such a road, and no other, as the statute required and the defendant undertook to build—such a road as the government was bound to accept in full satisfaction of this part of the contract. And the defendant is entitled to stand on the terms of the contract. A very inferior road is capable of use, and sometimes of a profitable use, and this road, although as good as could reasonably be expected under the circumstances at that stage of its progress toward completion, was certainly in many particulars an imperfect one on July 15, 1869, and for a considerable time thereafter. It was not then completed up to the standard required by the act of congress, and was not such a road as the government was bound to accept as completed. It was not, in fact, a road completed in any just sense. It is manifest, from the testimony, that the report of the "eminent citizens," of October 30, 1869, is extremely favorable to the defendant; yet this report required the sum of $576,650 to be expended to complete the road; and the government very properly insisted upon the expenditure being made before it would accept it as completed; and it retained in its hands ample means to insure a full performance of the contract on the part of the defendant.

That this report was not unjust to the defendant is evident from the circumstance that defendant did in fact, between the date of said report and October 1, 1874—the date at which the road was accepted by the government as complete—expend the sum of $5,657,854.40, being more than four millions over the sum reported. It is by no means probable that this large sum was unnecessarily expend-

ed, and the testimony shows that is was, in fact, required to bring the road up to the standard of a really first-class road, as required by the statute. This is much more than the amount sought to be recovered by the government, and so far as the mere discharging of the contract to build the road is concerned, independent of other considerations, the defendant might well have afforded to pay the $1,800,000, now claimed as five per centum of net profits, if the government had accepted the road as completed on July 15, 1869, and relieved the defendant from the payment of these five millions of dollars and over to complete the road, and had delivered up the bonds and patented the lands withheld as security, to which it would then have been entitled. It was manifestly not contemplated by the statute that the defendant should be called upon to apply five per centum of the net earnings of its road to the payment of the subsidy bonds, so long as it required any portion of its resources to be expended in the work of construction so as to complete the road up to the standard required by the act. The fact that the defendant, by an energetic prosecution of the work, so far constructed the road as to enable it to be used profitably several years before the time provided for its completion, and before its actual completion up to the required standard, has no bearing upon the question at issue. If it did, it would, also, be found that the government was equally benefited, for it had the use of the road for all the purposes contemplated by congress in passing the act during the whole time it was available to the defendant, and as an entirety for more that six years earlier than was called for in the act of congress; and this direct pecuniary profit to the government, by reducing its expenditures in various ways, if the official reports of the railroad committees of congress are to be relied on, amounted to several millions of dollars per year—nearly or quite enough to pay the interest on the subsidy bonds. The government, therefore, has lost nothing by this early use of the incompleted road, but, on the contrary, has been the gainer of several millions of dollars a year during the whole period of such use. But the question here is not as to the comparative advantages derived by the parties from the building and use of this road; or whether the government did not make a more liberal grant than was necessary; or whether it might not have made a better bargain in other respects; or whether the defendant has, or has not, obtained a more profitable contract than it ought to have had. Whatever considerations of this character may be urged elsewhere, when the parties come into a court of justice to seek an adjudication of their rights, they stand upon their contract as it is, and the simple dry question is, what is the contract, in fact and in law, and what are the rights of the parties under it? If this were a contract between two natural persons—private citizens— it does not seem possible that there could be any controversy as to the construction to be given to the words "after said road is completed," in relation to the question under consideration; and that the construction would be, completed as a whole up to the standard prescribed by the contract, so as to require an acceptance from the other party and a discharge of the party building from any further liability for the purposes of construction. If this would be the natural and proper construction, as between private parties, a different one certainly cannot be claimed, or, if claimed, admitted, because the government on the one side and a corporation on the other happen to be the parties to the transaction, and the contract chances to be found in a statute.

It has been further urged, with some earnestness and apparent sincerity, that the defendant is estopped from denying the completion of the road on July 15, 1869, in consequence of presenting its statements of completion, and its claim to have the road accepted as completed; and because it has accepted so much of the consideration from the government as it was able to obtain. But many elements of an estoppel are wanting. The government did not rely upon this statement, and accept the road. The statement was only filed in pursuance of the statute, as a basis to set in motion the commissions appointed under the act to examine and report to the president. It was the examination and report of the commission upon which the president was authorized to act, and upon which he did in fact act. In this case he not only acted, but refused to accept the road as completed in accordance with the statute until November 14, 1874, when he, for the first time, accepted the road as complete, and released the securities held to insure completion, which had till that time been withheld from the defendant, and which were fully ample to protect the government in case of defendant's default.

My conclusion is, that the defendant's liability to apply five per centum of the net earnings of the road to the payment of the subsidy bonds issued by the government and the interest thereon, did not accrue till October 1, 1874; and that the government is not entitled to recover any portion of the net earnings accrued prior to that date. The five per centum of the net earnings accrued since October 1, 1874, had not become due at the time this action was commenced. They are to "be annually applied" only. The demand in this case, made by the secretary of the treasury on defendant, was on November 14, 1874, and the suit itself was commenced on April 20, 1875, the former within two, and the latter within seven months after the completion of the road. As to the portion of the net earnings now due, therefore, this action is premature.

There is, also, a wide difference between the claims of the parties on the other point suggested, as to what constitutes "net earnings"

within the meaning of the statute. When it becomes necessary to determine this question, it is quite probable that neither party will be found to be wholly right in its construction of the words "net earnings." But under the view I take, it will be unnecessary to consider that point now.

Let there be a finding and judgment for the defendant.

[Taken by writ of error to the supreme court, where the judgment above was reversed, and the cause remanded for a new trial. 99 U. S. 449.]